IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>GEORGE L. LIAKOS,<br><br>                    Defendant. | 4:21-CR-3129<br><br>FINAL RESTITUTION FINDINGS |

      This matter is before the Court for a final determination of the amount of restitution to be awarded pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. The facts of this case, summarized briefly, revolve around one count of bank fraud which induced Great Western Bank to issue four promissory notes to the defendant, George L. Liakos. Various collateral secured the notes, including real estate located in Bayard, Nebraska, and the defendant's machinery, equipment, commodities, and livestock. The Court determined that the loss calculation for sentencing purposes was $3,940,007.80, based on evidence adduced by the government. *See* filing 85-1 at 9. The Court deferred its final determination as to restitution.

      While the Court has reiterated the legal standard guiding the loss and restitution calculations for this case several times, it will set forth those principles once more. The government has the burden to prove actual loss, for fraud purposes, by the preponderance of the evidence. *United States v. Markert*, 774 F.3d 922, 925 (8th Cir. 2014). Similarly, the government must prove restitution is warranted by a preponderance of the evidence, by showing the actual, provable loss. 18 U.S.C. § 3664(e); *United States v. Martinez*, 690 F.3d 1083, 1088 (8th Cir. 2012). Interest costs are excluded for the purposes of

the loss amount, but the restitution owed may include interest. *United States v. Alexander,* 679 F.3d 721, 731 (8th Cir. 2012).

Any of the fraudulently obtained funds that were actually recovered by the bank from its later sale of collateral should be offset against the loss calculation. U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *see also Robers v. United States,* 572 U.S. 639, 640-41 (2014); *United States v. Oladimeji,* 463 F.3d 152, 160 (2d Cir. 2006); *United States v. Shepard,* 269 F.3d 884, 887-88 (7th Cir. 2001). If any collateral has not been disposed of, the defendant may be credited with the fair market value of the collateral at the time of sentencing. § 2B1.1 cmt. n.3(E)(ii); *see also Alexander*, 679 F.3d at 730. And while the government bears the burden of demonstrating the amount of the loss sustained as a result of the offense, the *defendant bears the burden* of establishing *entitlement to an offset* against that loss. *United States v. Miell,* 744 F. Supp. 2d 961, 965 n.8 (N.D. Iowa 2010); *see also United States v. Pugh,* 445 F.3d 1066, 1068 (8th Cir. 2006) (burden is on defendant to show payment of restitution debt).

The government's calculation of the loss attributable to the defendant's fraud included the principal amounts owed on each of the four loans on which the defendant defaulted. Filing 85-1 at 9;[1] filing 85-1 at 10-21. The government also included $3,903,984.32, the value of a lien on the Bayard property. *See* filing 70-2 at 4-5. The government's calculation credited the defendant with $60,831.66 in disaster relief funds,[2] $1,286,514.51 in personal property sold,

---

[1] This page of the government's evidence represents a summary of the documents used by the government to calculate the loss.

[2] The loss calculation in the Revised Presentence Investigation Report relied on a civil judgment from the District Court of Morrill County, Nebraska, in which the court granted summary judgment in favor of Great Western Bank. *See* filing 92 at 8; filing 70-2. The calculation in the summary judgment order did not account for the disaster relief funds, so

2

$1,562,087.16 in commodities sold, and $8,050,166.00 in real estate property sold. *See* filing 85-1 at 9; filing 85-1 at 16. These figures combined support a loss calculation of $3,940,007.08. For restitution, in addition to this figure, the government seeks $1,119,027.63 in accrued interest for a total restitution amount of $5,059,035.43. *See* filing 85-1 at 9.

The defendant argues that no restitution is warranted in this case because the value of the defendant's collateral exceeded the value of the bank's loss, and the bank improperly disposed of the collateral. At his sentencing hearing, the defendant argued that, by his calculations, he is actually *owed* $311,000. *But see* filing 78 at 5 ("If the value of these items is included in the [loss] calculation, there would be a surplus of $137,500.00.").

The defendant makes three discrete arguments. First, he asserts that the offsetting credits the government applied undervalue the defendant's collateral. *See* filing 78 at 4-5; filing 75-1. He also argues that approximately $500,000, the amount the bank spent to acquire a preexisting superior lien, should not be included in the restitution calculation because that payment was voluntarily incurred by the bank for the bank's convenience, and was not caused by the defendant's fraudulent conduct. Filing 78 at 3. Finally, the defendant argues that he is entitled to, approximately, a $60,000 credit, representing earnest money paid by a third party as a deposit on some of the defendant's property. *See* filing 75-3; filing 85-1 at 50.

The Court made the following determinations regarding the loss calculation, and will rely on them to calculate restitution:

---

the government has credited the defendant with those funds in an updated calculation. *See* filing 85-1 at 9.

*Value and Disposition of Defendant's Collateral*

The defendant makes a number of arguments about the disposition of his collateral, which effectively boil down to a position that the bank received far less than it could or should have for the collateral it sold. At his sentencing hearing, the defendant did not argue that the bank, in a *legal* sense, unreasonably disposed of the collateral. Rather, the defendant argued that it isn't *fair* that his property was sold at auction and the bank was only able to recover a fraction of the value of the collateral, and now he is financially on the hook without the benefit of the full value of his real estate, commodities, and personal property. To illustrate this point, the defendant provided that a John Deere trailer, which he valued at $320,000, sold for only $160,000. *See* filing 86.

Relatedly, the defendant contests the fair market value of the Bayard property. The bank obtained $5,788,908 for the property, but the government is offsetting the loss amount by $6,325,000. *See* filing 85-1 at 9; filing 70-2 at 6. The higher figure represents a fair market appraisal of the property, which the government offered as the appropriate amount with which to credit the defendant. The defendant asserts that the actual value of the Bayard property is either $8.5 million or $10.5 million, based on the defendant's estimation and a property listing of some of the Bayard acres that a third party purchased from the bank and is now attempting to sell. *See* filing 87.[3]

---

[3] The defendant represented that a copy of the listing was attached to his filing. *See* filing 87. However, the purported "listing" is actually a "Notice of Final Payment Due" addressed to the defendant from the bank, and in no way reflects the value of any acres of land in Bayard, Nebraska, or anywhere else. *See* filing 87-1. Even assuming the defendant provided what he said he did, a property listing is not a commercially reasonable methodology of appraising property.

4

The defendant has not credibly shown that the bank did not use commercially reasonable methods to dispose of the collateral. While an auction sale may or may not yield a fair market value for personal property, the bank needed to recoup millions of dollars in losses because the defendant defrauded it. So, it is fair, and legal, that the defendant remains on the hook for the bank's losses. Further, the defendant's opinion as to the value of his collateral is not supported by any type of commercially reasonable methodology for appraising property, and therefore is not credible for these evidentiary purposes. The law does not afford the defendant any additional credits when the bank used standard, commercially reasonable procedures to recover the losses it incurred because of the defendant's fraud. *See* Neb. Rev. Stat. U.C.C. §§ 9-610, 9-627; *Alexander*, 679 F.3d at 730.

The defendant also argued that some collateral was not disposed of, or that he was not credited with the value of that collateral. Specifically, the defendant referenced a sprayer and tractor financed by 21st Century Equipment and a 2005 Peterbilt truck financed by Northland Capital. *See* filing 78 at 5; filing 85-1 at 7. The government, pursuant to a subpoena, produced records that these items were repossessed by the financers, and the bank did not receive any funds for them. Filing 85-1 at 52-61. The loss calculation cannot be offset by funds the bank did not receive.

*Prudential Lien*

When the defendant provided the Bayard property as security to the bank in 2019, the property was already subject to a lien by Prudential Insurance Company of America for approximately $3,403,984.32. *See* filing 70-2 at 4-5; filing 85-1 at 9; filing 78 at 3. After the defendant defaulted on his loans, the bank acquired the Prudential lien before initiating foreclosure proceedings. *See* filing 70-2 at 5. The defendant asserts that the bank paid a

$500,000 premium to acquire the lien, which the government included in the value of the Prudential lien, for a total of $3,903,984.32. *See* filing 85-1 at 5, 9.[4]

The defendant asserts that the bank acquired the lien for its own convenience, and not as a direct result of the defendant's fraud, so the $500,000 premium should not be included in the loss calculation or restitution. The loss calculation, and restitution amount, include any reasonably foreseeable pecuniary harm. *See* § 2B1.1 cmt. n.3(A)(iv). The bank would not have acquired the lien but for the defendant's fraudulent representations, and the defendant reasonably should have known that if he defaulted on his loans, the bank would need to take care of the Prudential loan in a commercially reasonable manner. It was neither unforeseeable nor commercially unreasonable for the bank to incur additional costs related to the Prudential lien before it could sell the Bayard property. For these reasons, the defendant is responsible for the $500,000 premium.

### *Earnest Money*

Finally, the defendant argues he should be credited with approximately $60,000, which was an earnest money payment the bank received related to the bank's sale of part of the Bayard property. *See* filing 75-3; filing 78 at 4; filing 85-1 at 50. It appears this transaction occurred after the bank initially disposed of the defendant's property. *See* filing 85-1 at 50. As described above, the defendant has been credited with a fair market appraisal of the property, and not with any of the funds the bank actually received by disposing of the property. It is unclear why the defendant should receive the benefit of a fair market appraisal *and* credit for funds the bank received by third parties while trying to recover the fair market value of the property. This $60,000 value

---

[4] There is no documentation in the record as to this fee, but the government does not dispute that the bank paid it. *See* filing 85-1 at 5.

6

obtained by the bank for the (failed) sale of some of the Bayard property is effectively reflected in the $6,325,000 value with which the defendant is credited, and the defendant has not met his burden to demonstrate that he is entitled to any additional offsetting credits related to this payment.

*Final Restitution Determination*

The government has met its burden of showing the restitution amount. The restitution includes the unpaid sum of the loans, plus interest, less any funds recovered by the victim by the sale of collateral or other funds received pursuant to the security agreement. 18 U.S.C. § 3664(e); U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *Alexander*, 679 F.3d at 731. The defendant has not demonstrated any other offsetting credits, so the Court will rely on the government's evidentially supported calculations. *See* filing 85-1 at 9. Therefore,

IT IS ORDERED that the defendant, George L. Liakos, pay $5,059,035.43 in restitution.

Dated this 1st day of November, 2023.

BY THE COURT:

John M. Gerrard
Senior United States District Judge